2024 IL App (1st) 241540-U

No. 1-24-1540B

First Division
November 4, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 21 CR 14899 |
| v. | ) ) | |
| ROBERT DRUMMOND, | ) ) | Honorable Sophia Atcherson |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the circuit court's order denying defendant-appellant's pretrial release, where the court found that the State had met its burden on all three elements of its detention petition.

¶ 2   In 2021,[1] prior to the passage of major criminal law reform in Illinois, defendant-appellant, Robert Drummond, was arrested and subsequently charged for violating various sections of the Code of Criminal Procedure of 2012. Specifically, defendant was charged with crimes related to the murder of his pregnant girlfriend, Yarianna Wheeler, and her unborn child. Such charges included: (1) three counts of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2020)), (720 ILCS 5/9-1(a)(2) (West 2020)), (720 ILCS 5/9-1(a)(3) (West 2020)); (2) three counts of intentional homicide of an unborn child (720 ILCS 5/9-1.2(a)(1) (West 2020)), (720 ILCS 5/9-1.2(a)(1) (West 2020)), (720 ILCS 5/9-1.2(a)(2) (West 2020)); and (3) one count of armed robbery without a firearm (720 ILCS 5/18-2(a)(1) (West 2020)).[2] At some point after defendant's arrest, a bond hearing was held and he was ordered detained without bail pending trial.[3]

¶ 3   A few years later, the Illinois Legislature passed Public Act 101-652, commonly referred to as "the Safety, Accountability, Fairness, and Equity-Today (SAFE-T) Act" or the "Pretrial Fairness Act" (Act). See Pub. Acts 101-652, § 10-255 (eff. Jan. 1, 2023); 102-1104, § 70 (eff. Jan. 1, 2023); Ill. S. Ct. R. 604(h)(1) (eff. Oct. 19, 2023); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting stay and setting effective date as September 18, 2023). Subsequently, on April 16, 2024, defendant filed a motion seeking his release from continued pretrial detention under the new statutory scheme.

---

[1]The record confusingly reflects that defendant was arrested on September 9, 2021, but also that a new warrant was re-issued, and he was again arrested on November 3, 2021. The record does not contain any explanation as to this timeline of events.

[2]The charging documents do not appear in the record. We have derived these facts from other documents therein.

[3]The record also does not contain any indication of when this hearing was held, what the order for detainment stated, or when defendant was first ordered detained. The report of proceedings solely indicates that the current judge presiding over defendant's most recent detainment hearing became involved in the case at some point in 2022.

¶ 4    On July 9, 2024, the State filed a verified petition for a pretrial detention hearing pursuant to articles 110-2 and 110-6.1 of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/110-2, 110-6.1 (West 2022)). That same day, following a hearing on the petition and defendant's motion to vacate, the circuit court granted the State's request. On July 11, 2024, defendant filed a motion for relief pursuant to Supreme Court Rule 604(h)(2) (eff. April 15, 2024). The motion was heard on July 16, 2024, and was subsequently denied. Now, in this interlocutory appeal, defendant argues that the circuit court erred in ordering pretrial detention on all three bases of the State's petition. For the reasons that follow, we affirm the circuit court's detention order.

¶ 5                          I. BACKGROUND

¶ 6                    A. Original Detainment Proceedings

¶ 7    As noted, defendant was ordered detained before the Act's passage. Although we have limited documentary evidence of the details of defendant's arrest and earlier court proceedings, the record includes a supplemental "Public Safety Assessment" (PSA) conducted by "pretrial services" on November 6, 2021.[4] Therein, the PSA rated defendant's "new criminal activity score" as a "4" out of "6," and a "failure to appear" score as a "2" out of "6." It also rated his "new violent criminal activity flag" as a "yes." Finally, the PSA stated that, if defendant were to be released, "maximum conditions" should be imposed.

¶ 8                    B. State's New Detention Petition

¶ 9    Although defendant's motion to vacate his detention order was filed prior to the State's petition, we first discuss the State's petition in order to provide context to the case, as defendant's motion challenges the State's timeline of events and procured evidence.

---

[4]The record does not reflect that an additional PSA was conducted in light of the Code's amendments or defendant's motion to vacate his detention order.

¶ 10    On July 9, 2024, the State filed its verified petition, which is the subject of this appeal. Therein, the State argued that defendant was eligible for pretrial detention because the charged offenses of first degree murder, intentional homicide of an unborn child, and armed robbery were non-probationable felonies and/or forcible felonies pursuant to sections 110-6.1(a)(1) and (a)(1.5) of the Code (725 ILCS 5/110-6.1(a)(1) (West 2022)), (725 ILCS 5/110-6.1(a)(1.5) (West 2022)); (2) defendant posed a "real and present threat to the safety of any person or persons or the community;" and (3) there were "[n]o condition or combination of conditions set forth in [725 ILCS 5/110-10(b) (West 2022)] *** to mitigate that risk." With regard to the second element, the State asserted that:

"On August 10, defendant asked his girlfriend, [Yarianna Wheeler], to meet him at the Lake Michigan beach near his home. When defendant arrived, he located victim, and walked to the lake shore with her. Victim never returned and was never seen or heard from again. She was found dead, floating in Lake Michigan near Waukegan approximately 5 days later. She suffered multiple stab wounds and died as a result. Defendant left the lake shore with victim's purse and belongings. Defendant was seen on security video using victim's Link card two times shortly after the victim's body was recovered. When defendant was arrested, he was still in possession of victim's Link card. Victim was 7 months pregnant with defendant's baby when he killed her."

¶ 11                              C. Defendant's Original Motion to Vacate

¶ 12    On April 16, 2024, defendant filed a motion to vacate his existing detention order.[5] With regard to the first element of the petition, defendant argued that the State was unable to meet its

---

[5]Again, we do not know the date of this order.

burden of proving, by clear and convincing evidence, that the proof was evident and the presumption great that he had committed the charged offense of first degree murder, as the State's case was based on circumstantial, rather than direct, evidence. In turn, defendant addressed the evidence against him. First, defendant attacked various surveillance videos on the day of the murder that depicted the victim at the beach with an unidentified male. Defendant asserted that the videos were unclear, and that nothing therein showed the individual attacking the victim or using any weapons against her. Second, defendant challenged the State's obtaining of cell phone location data, which showed that his cell phone had "pinged" near a location where the victim had last been seen. Defendant noted again that this evidence was circumstantial, as his residence was less than a mile away from the beach where the victim had travelled to, at 4333 S. Berkeley Avenue in Chicago.

¶ 13    With regard to the second element of the petition, defendant argued that the State could not show that he posed a real and present threat to the safety of any person or the community. Defendant asserted that he was 23 years old and had been 21 at the time of the incident, had attended Butler College Preparatory High School in Chicago, where he had maintained an A and B average at school, and had "strong familial ties" as his family was often present at his court appearances. Next, defendant stated that he had no prior criminal convictions or criminal history.[6] Although defendant acknowledged that the current charged offenses were of a violent nature, he reiterated that there was no evidence linking him directly to the victim's murder.

¶ 14    With regard to the third element, defendant argued that the State could not prove that he was at risk for failing to appear at future court dates, or that no combination of conditions could

---

[6]As the record later demonstrates, this assertion proved to be incorrect.

mitigate his willful flight.[7] Defendant contended that the State could not solely meet its burden by relying on the charges and facts of the case, citing *People v. Stock*, 2023 IL App (1st) 231753, in support. Additionally, defendant asserted that the State had not "acknowledged any of the potential mitigating factors" contained in section 110-10(b) of the Act, which allowed for home supervision or electronic monitoring as potentially appropriate conditions. Finally, defendant asserted that he had been present at every court date and would continue to appear at future ones in order to care for his family and his livelihood.

¶ 15                    D. New Pretrial Detention Hearing

¶ 16    On July 9, 2024, the State and defendant appeared before the circuit court on the State's petition and defendant's earlier filed motion to vacate.

¶ 17                    1. The State's Proffer

¶ 18    Prior to proceeding with its proffer, the State informed the court that defendant had been detained since November 2021, and the court had already denied two motions to reduce his bond. The State had also tendered discovery to defense counsel, which included, *inter alia*, arrest reports, which contained defendant's statements to police; records associated with the victim's Link card; records from Lyft and Uber; defendant's employment records from Home Run Inn; defendant's medical records from the University of Chicago; video surveillance and video exhibits from various locations across the city; and the victim and defendant's phone records.

¶ 19    Proceeding with its proffer, the State argued that the proof was evident and the presumption great that defendant had committed the non-probationable felonies of first-degree murder, intentional homicide of an unborn child, and armed robbery. According to the State, on August 10,

_____

[7]We observe that, during the hearing, the court expressly noted that the State was not seeking detention on the basis that defendant was a flight risk, but rather, a threat to the community.

2021, the 19-year-old victim was seven months pregnant and had been living in a shelter. Defendant was 21 years old. Both the victim and defendant believed he was the father of the victim's unborn child. That day, defendant and the victim were captured on various surveillance videos across the city. Notably, all surveillance video showed the victim wearing a "distinctive" pink dress and flip flops, with her hair tied back and carrying a large pink purse.

¶ 20    Prior to leaving the shelter, the victim spoke to several friends and employees. She told them she was going to the Shedd Aquarium, and was excited as she had never been there prior and had purchased the tickets for herself and defendant as a birthday treat. After she left the shelter, she was not heard from again.

¶ 21    Next, through surveillance video, defendant and the victim were seen at the Shedd Aquarium entering and exiting the facility together. The two were then seen on surveillance video going to a Portillo's location for lunch. While eating lunch, the two had an argument and went their separate ways. Cell phone location data confirmed that defendant waited for a CTA train to go home. The victim travelled to a movie theater alone via Uber, which was confirmed by surveillance records and her cell phone location data. After defendant and the victim separated, the victim called defendant's cell phone over 25 times.

¶ 22    During the course of the night, the victim was also in contact with her friend, Malik Miller, through text and Facebook messaging. Miller had been at home that evening in Bellwood, Illinois. Miller knew about defendant but had never met him. Around 9:30 p.m., the victim called Miller and left him a voicemail, which apparently had been meant for defendant. The voicemail indicated that the victim was going to the beach and wanted to know where to meet. Miller did not hear from her after that phone call.

¶ 23    Once at the movie theater, the victim decided not to see a movie and instead called another Uber at 9:50 p.m. While in the car, the victim called defendant again. The two spoke while the Uber travelled to 39th Street Beach in Chicago. The Uber driver overheard the victim speaking to a person on the phone. He assumed she was talking to her boyfriend based on the content of their conversation. The two discussed a meeting point on the beach.

¶ 24    At 10:01 p.m., the Uber arrived in the beach parking lot. The driver did not see who the victim was meeting. The location of the victim's drop-off was a few blocks away from defendant's home at 43rd Street and Berkeley Avenue. After exiting the car, the victim walked down the path to the beach alone and remained on the phone with defendant. Video surveillance showed the victim wearing the same pink dress and carrying the same pink purse. The beach was mostly deserted. However, cell phone records showed that defendant was also in the area at the time.

¶ 25    Fifteen minutes later, video surveillance showed the victim walking side-by-side with a man believed to be defendant. However, his identity could not be confirmed as the video was grainy. The two headed towards the water at Oakwood Beach on 41st Street and disappeared from camera view. Approximately 30 minutes later, the same unknown man was seen on video walking away from the water alone but carrying the victim's purse. Minutes later, the man was captured on "POD" video at 43rd Street and Berkeley Avenue, again walking and holding the same purse. Video from the opposite end of the block showed the man carrying the purse but never exiting the block.

¶ 26    The next day, on August 11, 2021, defendant sent a text message to an individual named Dejana Young, who the State believed to be defendant's new girlfriend. He indicated that he was going to get his hand checked out as he might have injured a nerve. On August 12, 2021, defendant took a photograph of a cut on his hand, for which he later sought treatment at the University of

Chicago. Defendant stated to hospital personnel that he had received the wound while cooking. Defendant later told Young that he had cut his finger while working at the Home Run Inn. However, employment records from Home Run Inn indicated that he had not been at work between August 7 and 18, 2021.

¶ 27    On August 15, 2021, the victim's body was recovered from Lake Michigan in Lake County, Illinois, near Waukegan. A Jane Doe investigation was opened. The Lake County Medical Examiner's Office received the body, confirmed it to be Yarianna Wheeler, and determined that her death had been the result of an assault. She had also sustained multiple injuries to her body, including significant sharp-force injuries to her left lung and left hemidiaphragm, bilateral rib fractures, and stab wounds to her back, chest, neck, and arms. There was also evidence of drowning, and a deceased male fetus was detected in her uterus.

¶ 28    After the victim was identified, the Lake County Sheriff's Office and CPD conducted a search of Oakwood Beach. Detectives recovered one of the victim's flip flops, which matched another shoe found on her body in the water at Oakwood Beach. Detectives also recovered the victim's COVID mask, jewelry, and a headwrap that she had been seen wearing on earlier surveillance video.

¶ 29    On September 9, 2021, defendant travelled to Albion, Michigan, to visit Young. Along the way, defendant used the victim's Link card to purchase $300 worth of Red Bull.[8] On the date of his arrest in September[9], defendant attempted to give the victim's Link card to an unknown woman at the scene. The card was recovered and confirmed as belonging to the victim.

---

[8]There is some confusion in the record as to whether defendant used the victim's Link card once or twice.

[9] The record reflects both a September 9, 2021, arrest date and a November 3, 2021, arrest date.

¶ 30    On November 3, 2021, defendant was arrested again. He admitted to dating the victim and that she had been pregnant with his child. He told police that he had introduced her to his family as his girlfriend, and that his family had helped her take pregnancy tests. Defendant admitted to being with the victim on the date of her murder and that, while at Portillo's, they had a disagreement about seeing a movie that night.

¶ 31    Next, as to whether defendant posed a real and present threat to the safety of any person, persons, or the community, the State asserted that defendant had been "willing to stab a 19-year-old woman who was carrying his child in order to avoid responsibility of parenthood." Regarding defendant's criminal history, the State informed the court that on February 6, 2019, defendant had been sentenced to two years' probation for an aggravated robbery conviction involving two victims. Specifically, defendant and two of his friends approached the victims. While one of the offenders served as the lookout, the second offender held what appeared to be a firearm and demanded one of the victim's property. Defendant approached the other victim and took her purse, cell phone, keys, debit card, and student ID. The three then fled from the scene.

¶ 32    The State additionally noted that defendant and a co-offender had also been arrested in the same area the next day on July 11, 2018, for an unrelated burglary to automobile charge. Defendant admitted that he had committed the first robbery and that one of his co-offenders had used a BB gun. After naming his other co-offenders, the burglary to automobile charge was dismissed via *nolle prosequi* as part of a plea deal on the aggravated robbery charge.

¶ 33    Finally, with regard to the third element of its petition, the State argued that, based on defendant's previous criminal background and the nature of the current charges, there was no condition or combination of conditions that could mitigate the risk to the community.

¶ 34             2. Defendant's Arguments Against Detainment and In Mitigation

¶ 35    Defense counsel challenged the first element of the petition, arguing that the State did not have clear and convincing evidence that defendant had committed first degree murder. Counsel characterized the State's theory of the case as "reaching," as it had only been able to establish that defendant and the victim had been in a dating relationship and had been together the day of her murder. Defense counsel noted that the two had been in a relationship for some time and that defendant's family had assisted in taking care of them prior to the victim living in a shelter. Defense counsel further asserted that the victim had also been dating other people, as shown through texts messages from the victim to her friends, and that it was possible that another could have been involved in her murder.

¶ 36    Defense counsel conceded that defendant had been with the victim at the Shedd Aquarium and Portillo's. However, counsel maintained that once defendant got onto the train to go home, he arrived and remained home, which was corroborated by defendant's mother. With regard to the Uber driver's observations, defense counsel contended that there was no evidence to show that the victim had been on the phone with defendant, as the conversation had not been on speakerphone and the witness could not provide a name as to the other individual. Defense counsel also pointed out that the victim had left a voicemail on Malik Miller's phone, which had indicated that the two had planned to meet at the beach. Defense counsel further challenged the State's suggestion that this voicemail had been intended for defendant, not Miller, and posited that Miller could be an alternative suspect, given that he did not have an alibi at the time of the victim's death. Moreover, defense counsel reasoned, even if cell phone data showed that Miller's phone was located at his home at the time of the call, that did not mean that he was also at the house at the same time.

¶ 37    With regard to the video surveillance at the beach, defense counsel conceded that defendant lived about half a mile away, but that there was no way to identify who the individual was given

the video quality. Further, although defendant admitted that defendant's phone records placed him nearby, the records had never directly "pinged" him at the beach. Defense counsel acknowledged that the videos also showed an individual walking with the victim's belongings on defendant's block but pointed out that the video never showed the individual go into or out of defendant's home, which was located at the end of the block. Finally, defense counsel noted that defendant called the victim's phone several times that night and the next morning to look for her, and also left a voicemail with the shelter indicating his concern that he had not spoken with her.

¶ 38 As for the evidence collected during defendant's arrest, defense counsel pointed out that the police never found the victim's bag, any of her other belongings, or a murder weapon. Police also did not find fingerprints or DNA, and instead solely found a towel with blood on it, but analysis later revealed that it was not human blood. With regard to the victim's Link card, defense counsel challenged the State's interpretation of defendant attempting to pass off the victim's card to another. Defense counsel asserted that the card had been located in defendant's wallet, and that he had tried to give his personal items to the individual who was at his home at the time of arrest. Defense counsel further noted that the State was unable to tell how he obtained the card or whether it had been located in the victim's bag and reasoned that his use of the card did not indicate that he knew she was dead.

¶ 39 Finally, regarding the real and present danger element of the State's proffer, defense counsel argued that the State could not meet its burden solely on the nature of the current allegations, citing *People v. Stock*. Defense counsel acknowledged defendant's aggravated battery conviction, but indicated that he had been 18 years old at the time and had successfully completed probation after pleading guilty. In this case, defense counsel pointed out, defendant also went to the police "without incident." Finally, defense counsel directed the court's attention to various

letters of recommendation, defendant's high school grades, and certificates earned while in prison to indicate his good character.

¶ 40    Finally, defense counsel argued, even if defendant was a real and present danger, there were "mitigating factors" that could preclude pretrial detention, suggesting as alternatives, electronic home monitoring or pretrial supervision.

¶ 41                                    3. State's Rebuttal

¶ 42    The State noted that its theory or motive of the case "did not matter" at this juncture, as it did not have to prove its case at a pretrial detention hearing. Returning to its factual proffer, the State suggested that defendant had thrown the victim into the lake and then had sent her text messages to set up an alibi defense for himself. The State further pointed out the significance of the victim's Link card, given that she had been homeless at the time of her death, and reasoned that, based on the victim's current financial position, it did not make sense that she would have given someone her only source of purchasing food. The State further observed that when defendant had used the Link card, he had not used it to buy necessities, but rather, energy drinks on his way to visit his new romantic partner. These actions, the State concluded, showed an "unbridled disregard" for the victim's circumstances, her whereabouts, her health, or the unborn child.

¶ 43                                    4. Circuit Court's Ruling

¶ 44    Prior to ruling, the court noted, *inter alia*, that the current proceeding was "not a trial" and that the State's burden on a detention petition was "very different." The court stated that it had first become involved in the case in 2022 and had not found "any significant change in the evidence or information" during the hearing. However, the court had nonetheless allowed the parties to "engage in a full hearing to fully consider" the requests.

¶ 45    In granting the State's petition, the court found that the State had met its burden in establishing, by clear and convincing evidence, that defendant had committed the detainable offenses. Although the court acknowledged that there was some conflicting evidence regarding the status of the parties' relationship, both parties agreed that defendant and the victim were in each other's company the day of the murder and that she was pregnant with defendant's child. Further, the court continued, despite the two parting ways earlier in the day, the victim continued to reach out to defendant, with the victim's last known location within range of defendant's home. The court further acknowledged that the Uber driver had not definitively identified defendant as the individual on the phone, but the court did not find that to be dispositive. The court also noted that the video surveillance at the beach was unclear and could not be used to identify the individual there. However, the court continued, that same video showed that the individual had gone with the victim to the beach and had returned alone with what appeared to be the victim's purse. That same individual, the court stated, was later seen on the block where defendant lived, and although he was not seen going into the home, both parties agreed that he had gone there after being in the victim's company. The court also acknowledged that there was evidence of the victim leaving voicemail messages on another individual's phone around the same time period, but rejected that evidence as dispositive given that the other individual's phone records placed him at home at the time the call was made. Moreover, the court reasoned, that same argument could be made as to defendant's own cell phone history and whereabouts that night.

¶ 46    Next, the court observed that defendant had suffered an injury to his hand, which he had discussed with others the day after the victim was last seen on the beach, and who was later discovered with "sharp-force injuries." The court noted that defendant had sought medical treatment a few days after the victim was last seen, and although he claimed the injury to be work-

related, the State had procured evidence that he had not been at work at the time he had sustained the injury. Finally, the court stated that defendant had been discovered using the victim's Link card after her body was found, although both parties had their own interpretation as to how the card ended up in defendant's possession.

¶ 47    Second, the court found that defendant posed a real and present danger to the community based on the nature of the current charges and defendant's past criminal history. The court noted that the charged offenses were violent and committed against a person with whom he had been in a dating relationship, and thus "call[ed] into question whether he would then be willing to use violence against persons he was not thus connected to[.]" The court also pointed to defendant's prior violent conviction in 2019.

¶ 48    Last, the court found that there were no conditions that could mitigate defendant's threat. Specifically, the court did not find compelling that defendant had complied with his previous probation requirements in a "much less serious case," and reasoned that by pleading guilty, defendant had "[known] what he was getting" in order to remain out of jail. The court noted that the current charges were not "probationable matter[s]," and although it could impose conditions such as electronic home monitoring, that did not mean that defendant would not be inclined to cut off bands, move without permission, or commit crimes while such conditions were in place.

¶ 49    The court's written ruling, memorialized that same day, substantively parroted its oral ruling.

¶ 50                          E. Defendant's Motion for Relief

¶ 51    On July 11, 2024, defendant filed a motion for relief pursuant to Supreme Court Rule 604(h)(2) (eff. April 15, 2024). Although the motion expounded upon some of the evidence

presented during the hearing, it contained substantially similar arguments as in the original motion to vacate defendant's detention order as discussed prior.

¶ 52    On July 16, 2024, following hearing, the court denied the motion and this appeal followed.

¶ 53                                II. ANALYSIS

¶ 54                            A. The Procedure Code

¶ 55    The Procedure Code now presumes that all persons charged with a qualifying offense shall be eligible for pretrial release prior to conviction. 725 ILCS 5/110-2(a); § 5/110-6.1(e) (West 2022). Therefore, pretrial release may be denied *only* if a person is charged with a qualifying offense as delineated within section 110-6.1 of the Procedure Code and following the conducting of a corresponding hearing. *Id.* §§ 5/110-2; 5/110-6.1(e)-(f).

¶ 56    The Act also provides for reconsideration of pretrial detention for those detained prior to January 1, 2023, *i.e.* the initial effective date of the Act. See 725 ILCS 5/110-7.5 (West 2022). In particular, an individual who remains in pretrial detention and is eligible for continued detention under the Procedure Code is entitled to a hearing determined by the type of charged offense. 725 ILCS 5/110-7.5(b)(1)-(3) (West 2022). In particular, for those charged with first degree murder and armed robbery, the new hearing shall be held within 90 days of the defendant's motion for reconsideration of pretrial release conditions. *Id.* § 5/110-7.5(b)(1) (West 2022); *Id.* § 5/110-6.1(a)(1)-(7).

¶ 57    The State will also trigger the requirement for a pretrial detention hearing upon its timely filing of a verified petition for detainment. *Id.* § 5/110-6.1(a). The State must prove, by clear and convincing evidence, three elements in its petition: (1) that the "proof is evident or the presumption great" that the defendant has committed an eligible detainable offense (*Id.* § 5/110-6.1(e), (e)(1)), (2) that a defendant "poses a real and present threat to the safety of any person or persons or the

community, based on the specific articulable facts [of their case]," (*Id.* § 5/110-6.1(a)(6), (e)(2)) and (3) that there is "no condition or combination of conditions set forth" within the Procedure Code that could mitigate that real and present threat to the safety of any person, persons, or the community, based on the facts of the case (*Id.* § 5/110-6.1(e)(3)).

¶ 58 Following the filing of either a petition for detainment or motion for reconsideration of detention, the circuit court must hold a hearing. See *id.* §§ 5/110-6.1(a), (c), (f); *Id.* § 5/110-7.5(b)(1). Each decision regarding pretrial release is individualized, and no single factor or standard is determinative. *Id.* § 5/110-6.1(f)(7). If the court determines that the State has met its burden on its petition, the court must make a written finding summarizing its reasons for pretrial detention. 725 ILCS 5/110-6.1(h).

¶ 59 Following the grant or denial of pretrial release, an appealing party must first file a motion for relief before the circuit court that requests the same relief that will eventually be sought on appeal. Ill. S. Ct. R. 604(h)(2) (eff. April 15, 2024). Following the circuit court's review and denial of the motion, the party may appeal to the appellate court. Ill. S. Ct. R. 604(h)(1) (eff. April 15, 2024).[10]

¶ 60 With this framework in mind, we now turn to the merits of defendant's appeal.

¶ 61                                 B. Standard of Review

¶ 62 Defendant asserts that the correct standard of review is *de novo* as the circuit court's detention order was based on "proffered facts," citing *People v. Yost*, 2021 IL 126187, and *People v. Whittaker*, 2024 IL App (1st) 232009 (Ellis, J., concurring). However, defendant maintains that

---

[10]The motion for relief shall serve as the appellant's argument on appeal, but appellant may also file a supplemental memorandum in further support of the claims on appeal. Ill. S. Ct. R. 604(h)(7) (eff. April 15, 2024).

he would still be successful even under a more deferential standard of review, citing *People v. Johnson*, 2024 IL App (1st) 240154, and *People v. Pitts*, 2024 IL App (1st) 232336. The State responds that the correct standard of review is "in flux." However, the State posits that, under any standard, the circuit court's decision should be affirmed.

¶ 63     We stand in agreement with the State but again acknowledge, however, the ongoing and unresolved debate among the appellate districts, and even among the divisions in the First District, concerning the appropriate standard of review. See *People v. Parker*, 2024 IL App (1st) 232164, ¶¶ 46-50 (discussing and collecting cases on court split). Absent direction from our supreme court on this significant issue, we continue to find *People v. Saucedo*, 2024 IL App (1st) 232020, persuasive. As such, with regard to the first two elements of the petition, we apply the manifest weight of the evidence standard, where reversal is only warranted when the "opposite conclusion is clearly evident or if the finding itself was unreasonable, arbitrary, or not based on the evidence presented." *Saucedo*, 2024 IL App (1st) 232020, ¶¶ 31-32, 35; *Parker*, 2024 IL App (1st) 232164, ¶¶ 48-50; *People v. Reed*, 2023 IL App (1st) 231834, ¶ 24. With regard to the third element of the petition, we apply the abuse of discretion standard. *Saucedo*, 2024 IL App (1st) 232030, ¶ 36. Thus, when considering whether the circuit court's determination on the conditions of release factor was proper, we are mindful of the level of discretion afforded to such findings, where an abuse of discretion only occurs where the court's findings are "arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position adopted by the [circuit court.]" *Id.*

¶ 64                                    C. Arguments

¶ 65                              1. Detainable Offense

¶ 66     There is no dispute between the parties that the charged felony offenses of first-degree murder and armed robbery are detainable under the Procedure Code. See 725 ILCS 5/110-

6.1(a)(1), (a)(1.5) (West 2022), 725 ILCS 5/110-6.1(a)(1.5). Relying on arguments first raised in his motion for relief, defendant argues, however, that because the State relied on "circumstantial evidence" to prove that he committed the detainable offenses it failed to meet its burden and the court's grant of the petition was in error.

¶ 67 The State maintains that defendant's assertion that it solely relied on circumstantial evidence is incorrect, and even if so, the use of circumstantial evidence was enough to sustain its burden at this juncture. The State further asserts the evidence overwhelmingly established that it was defendant who murdered the victim and her unborn child, as well as robbing her of her purse and Link card.

¶ 68 We need not resolve any dispute as to whether the State's proffer consisted of direct or circumstantial evidence. As the circuit court noted in its ruling, the current proceeding was not a trial and the State's burden on a detention petition was "very different" therefrom. Even accepting that the State's proffer consisted purely of circumstantial evidence, we note that even a defendant's criminal conviction, which requires proof beyond a reasonable doubt, may be based solely on circumstantial evidence. See *People v. Brown*, 2013 IL 114196, ¶ 49; see also *People v. Williams*, 2024 IL App (1st) 241013, ¶ 35. Thus, we find defendant's argument to be without merit.

¶ 69 Further, defendant makes no argument regarding the sufficiency of the evidence to support the State's petition on this element, only the form of that evidence. Thus, we need not repeat the evidence presented here. Suffice it to say, after reviewing the record, we do not find that the circuit court erred in determining that the State had met its burden to show that the proof was evident and the presumption great that defendant had committed the charged offenses. Accordingly, we do not find the court's findings to be unreasonable or arbitrary.

¶ 70 2. Real and Present Threat

¶ 71    Similarly to the first prong, defendant again relies on his arguments made in his motion for relief, namely that the circuit court also erred in finding that he was a real and present threat. Defendant further adds that any showing of dangerousness regarding the charged offenses were "entirely circumstantial," and that defendant's prior conviction was not dispositive as he had not physically harmed anyone.

¶ 72    The State responds that the court properly determined that defendant was a real and present danger based on the violent and domestic nature of the charged offenses, the safety threat to the community, and defendant's prior criminal history. The State further rejects defendant's suggestion that the court relied too heavily on the nature of the offenses when determining dangerousness, and replies that the court properly took into account defendant's capacity for violence based on the specific articulable facts of the case. With regard to defendant's prior criminal history, the State contends that the court properly considered the violent nature of defendant's previous conviction, which also involved another dangerous weapon.

¶ 73    After reviewing the record, we do not find the court's conclusion that the State had met its burden on this element to be against the manifest weight of the evidence. The record reflects that the circuit court carefully considered all aspects of the proffer based on a variety of statutory factors, even after noting that it did not find the evidence or circumstances of the case to have changed from defendant's prior hearings.

¶ 74    First, the court properly considered defendant's history and characteristics with regard to his overall criminal background, of which, as we have noted above, we do not have any documentary evidence beyond the parties' assertions during the hearing. 725 ILCS 5/110-6.1(g)(2) (West 2022) (assessing defendant's history and characteristics, including prior criminal history). The hearing transcript reflects that, despite defendant's initial assertion to the contrary, defendant

was convicted of aggravated robbery in 2019 and served a probation sentence after pleading guilty. He had also been arrested for robbery of an automobile, a crime committed the very next day after the first offense, and which had only been dismissed in exchange for defendant's plea in the first case. On that point, the court further considered that defendant's very recent completion of probation clearly had not deterred him from allegedly engaging in more serious crimes. See *id.* § 5/110-6.1(g)(2)(A) (evidence concerning prior criminal history indicative of violent or assaultive behavior may also be considered in dangerousness assessment); *Id.* § 5/110-6.1(g)(9) (court may assess any other factors that it believes has a reasonable bearing on the defendant's propensity or reputation for violent, abusive, or assaultive behavior). Further, we reject defendant's contention that the aggravated robbery conviction was somehow less serious because no physical harm was done to those victims, given that a BB gun was purportedly utilized during the incident, and it otherwise appeared to be a completely random occurrence.

¶ 75    Next, the circuit court properly considered the nature and circumstances of the charged offenses, including the notion that the current charges were crimes of violence, as the victim's body was found to be assaulted and stabbed, and that defendant had been discovered using her Link card almost a month after her disappearance. *Id.* § 5/110-6.1(g)(1). More significantly, in both its rulings, the court expressly noted that the victim and defendant were both relatively young in age, were in a dating relationship, and that the victim was pregnant with defendant's child. See *id.* § 5/110-6.1(g)(5) (assessing dangerousness by way of defendant's age); *Id.* § 5/110-6.1(g)(6) (assessing dangerousness by way of the victim's age and physical condition); *Id.* § 5/110-6.1(g)(9) (court may also utilize factors under conditions analysis to determine dangerousness); 725 ILCS 5/110-5(a)(6) (West 2022) (court may assess whether the charged offense was an attempt to commit first degree murder against a current partner in a dating relationship); *Id.* § 5/110-

5(a)(6)(H) (court may assess the severity of the alleged incident, including abuse rendered during victim's pregnancy). Further, in so noting the relationship, the court orally reasoned that the domestic nature of the crime also called into question defendant's willingness to commit violence against unknown persons in the community, which was not unreasonable given the nature of defendant's prior conviction.

¶ 76    Finally, although not referenced by the court in its ruling, we observe that the record contains defendant's initial safety assessment conducted by Pretrial Services on November 6, 2021, around the time defendant was arrested. See 725 ILCS 5/110-6.1(f)(7) (allowing court to consider risk assessment tools in determining propriety of pretrial detention, although not solely dispositive); 725 ILCS 5/110-5(b) (same). Therein, defendant had scored a "yes" on the "new violent criminal activity flag," "4 out of 6" on the "new criminal activity scale," and "2 out of 6" on the "failure to appear scale." The assessment further indicated that, if defendant were to be released, "maximum conditions" were recommended.

¶ 77    As such, based on the record before us, we find that the circuit court fully considered all aspects of the proffer under the statutory requirements, which included a variety of factors ranging from the nature of the crime—and in particular the domestic relationship between defendant and victim—to defendant's individualized history and characteristics. Thus, we do not find that an opposite conclusion concerning defendant's real and present threat was clearly evident, or that the court's findings were unreasonable based on the evidence presented.

¶ 78                                    3. Conditions

¶ 79    Finally, defendant argues that the State did not present any evidence to demonstrate that there were no appropriate release conditions to mitigate any threat defendant presented to the community. According to defendant, the State failed to mention or discuss any specific potential

conditions, such as supervision, a ban on possessing dangerous weapons, a no-contact order, home confinement, curfew, GPS, or electronic monitoring, citing sections 110-5(g) and 110-10(b) of the Act. Additionally, defendant urges us to consider, as he did before the circuit court, *People v. Stock*, 2023 IL App (1st) 231753, for the proposition that a detention order is improper if the State solely presents evidence on dangerousness, but not whether conditions of release could mitigate that danger. Additionally, defendant contends that the court failed to fully consider the circumstances of his case in violation of the Act's mandate to consider the least restrictive conditions possible, citing *People v. Atterberry*, 2023 IL App (4th) 231028, in support. Specifically, defendant points out that the court did not explore other potential release conditions and instead only named one to be inadequate. Further, defendant argues, the court erred by finding that defendant's successful completion of probation for his prior conviction was not "compelling."

¶ 80     The State responds that courts are given broad discretion in fashioning conditions decisions, citing *People v. Horne*, 2023 IL App (2d) 230382, in support. Additionally, the State continues, in making a conditions determination, the court was required to assess similar factors to the dangerousness analysis. Here, the State argues, the court properly considered the required statutory factors in accordance with the specific facts of defendant's case, which included defendant's capacity for violence and prior criminal history. Further, the State points out, in both its written and oral rulings, the court noted specific reasons for why no conditions were appropriate. With regard to its own burden, the State rejects defendant's suggestion that the State was required to "utter specific words" at the detention hearing, citing *People v. Carpenter*, 2024 IL App (1st) 240037, in support. The State further maintains that it presented evidence that no conditions were adequate to mitigate defendant's threat, particularly where he had shown a

complete disregard for humanity in the commission of the crime and thereafter. Last, the State argues that *People v. Stock* is distinguishable.

¶ 81    We turn to the record. Preliminarily, we address defendant's contention that the State failed to present any evidence regarding the lack of appropriate conditions. The plain language of the Code indicates that the "dangerousness" assessment overlaps with the analysis of whether any conditions are appropriate in lieu of pretrial detention. Compare 725 ILCS 5/110-6.1(g)(9) (dangerousness analysis may include factors listed in section 110-5 of the Code, which provides similar statutory factors for conditions analysis); 725 ILCS 5/110-5(a); *Carpenter*, 2024 IL App (1st) 240037, ¶ 17 ("The proof as to the danger presented by a defendant's pretrial release will frequently overlap with the evidence supporting a conclusion that less restrictive conditions cannot mitigate the threat.") Thus, it is reasonable that the evidence presented for both the second and third prongs of a detention petition would overlap, especially when both sections of the statute consider the specific and articulable facts of the case. See 725 ILCS 5/110-5(a)(1) (assessing nature and circumstances of the charged offenses); *Id.* § 5/110-5(a)(2) (assessing weight of the evidence against defendant); *Id.* § 5/110-5(a)(4) (assessing nature and seriousness of the real and present threat posed by defendant based on the specific and articulable facts of the case); *Id.* § 5/110-5(a)(6)(A) (assessing whether the incident involves harassment or abuse as defined by Illinois Domestic Violence Act of 1986); *Id.* § 5/110-5(a)(6)(H) (assessing the severity of the incident that is the basis of the alleged offense, including whether the incident involved physical injury or assault during victim's pregnancy); 725 ILCS 5/110-6.1(g)(1) (assessing the nature and circumstances of the charged offense); *Id.* § 5/110-6.1(g)(4) (assessing defendant's statements in relation to the charged offense); *Id.* § 5/110-6.1(g)(5) (assessing defendant's age and physical condition); *Id.* § 5/110-6.1(g)(6) (assessing victim's age and physical condition). Further, the

"nature and circumstances of the crime charged may well be the most compelling evidence" available at a detention hearing. *Carpenter*, 2024 IL App (1st) 240037, ¶ 17.

¶ 82    Additionally, as noted by the State, the statute does not require that the State "utter specific words at a detention hearing." *Id.* ¶ 21. The record reflects that the State argued at the hearing that no conditions could mitigate defendant's threat already posed to two victims and to the rest of the community at large. Although it is true that the State did not explicitly respond to defense counsel's contention that certain types of conditions could be imposed, the circuit court's oral and written rulings addressed why such conditions were not adequate. In particular, the court noted that it did not believe electric home monitoring would be appropriate in light of the serious allegations against defendant, which involved two deceased victims, as well as the court's belief that defendant would not comply. See 725 ILCS 5/110-5(g) (West 2022) (electronic home monitoring may only be appropriate if it would reasonably ensure defendant's appearance or protect an *identifiable person* from imminent threat of serious physical harm).

¶ 83    Additionally, we also do not find error in the court's comment that it did not find defendant's compliance with his prior probation requirements to be compelling, given that the conviction was less serious in nature and that defendant had chosen to plead guilty knowing exactly what conditions he would be submitting to. See 725 ILCS 5/110-5(a)(5) (assessing the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process). Further, even if the victims in defendant's prior conviction had not been physically harmed, we derive from the court's comments on this point that defendant had not been deterred from allegedly engaging in further assaultive behavior following his conviction only two years prior. *Id.* § 5/110-5(a)(3)(A) (assessing prior criminal history and other court proceedings); *Id.* § 5/110-5(a)(3)(B)

(assessing whether, at the time of the current offense, defendant had completed a sentence for another crime).

¶ 84    Finally, we agree with the State that *People v. Stock*, 2023 IL App (1st) 231753, is not persuasive. In *Stock*, the defendant was charged with one count of the detainable offense of aggravated battery/discharge of a firearm. *Id.* ¶ 1. The defendant was alleged to have discharged a firearm at the time that the complaining witness, his estranged wife, was packing up their residence to leave him and pursue a divorce. *Id.* ¶ 5. At the defendant's detention hearing, Pretrial Services rated the defendant a "1 out of 6" on the "new criminal activity scale," and a "1 out of 6" on the "failure to appear scale." *Id.* ¶ 7. The record further reflected that the defendant had no other criminal history prior to the alleged offense. *Id.* ¶ 6. In granting the State's detention petition, the circuit court found that no conditions could mitigate the defendant's real and present threat because, per the written order, he had "shot a firearm at the complaining witness." *Id.* ¶ 8.

¶ 85    On appeal, the *Stock* court reversed and remanded the detention order. *Id.* ¶¶ 22-23. Although the court found that the State had met its burden on the first two elements of its petition, it failed on the conditions prong. *Id.* ¶¶ 13-15. The court noted that the State had presented "no evidence" on that element and had merely proffered the facts of the incident. *Id.* ¶ 17. Additionally, the court pointed out that, according to the record before the circuit court, the defendant had no prior criminal history and thus otherwise appeared to be an "upstanding and law-abiding member of the community." *Id.* ¶ 19. Finally, the court critiqued the circuit court's ruling, noting that neither the written order nor the oral ruling complied with the express requirement that the court provide a written summary as to why less restrictive conditions could not mitigate the threat posed by the defendant. *Id.* ¶ 20. Ultimately, the court reasoned that, "[i]f the base allegations that make up the *sine qua non* of a violent offense were sufficient on their own to establish this element, then

the legislature would have simply deemed those accused of violent offenses ineligible for release." *Id.* ¶ 18. However, the court cautioned, although "more [was] required" as to both the State's proffer and the court's analysis on this element, its holding was not to be interpreted to mean that "alleged facts stating the basic elements of an offense are not relevant or part of the proof that no conditions could mitigate the threat posed by a defendant." *Id.*

¶ 86    *Stock* is distinguishable in numerous ways. First, in *Stock*, the record failed to demonstrate that the State argued, let alone even mentioned, the applicable statutory provision governing the conditions analysis. See 2023 IL App (1st) 231753, ¶¶ 5, 17. In contrast here, the State argued at hearing that no conditions could mitigate the real and present threat posed by defendant, based on the egregious nature of the charged offenses as well as the defendant's prior criminal history. Second, whereas the *Stock* defendant had no prior criminal history to consider against appropriate release conditions, here defendant had at least two prior interactions with law enforcement, one that was violent in nature and resulted in defendant pleading guilty to aggravated robbery. Third, the circumstances of the alleged crimes here were much more deliberate in nature in comparison to the *Stock* defendant's apparent momentary lapse in judgment, given the State's proffer suggesting that defendant had taken numerous steps to create an alibi for himself by calling the victim's phone multiple times, lying about the cause of an injury to his hand, and attempting to get rid of the victim's Link card after using it to buy $300 worth of Red Bull.

¶ 87    Further, the court's consideration of the proffer was more substantive in nature than the one criticized in *Stock.* In our case, the circuit court assessed in a lengthy oral ruling whether any conditions were appropriate in lieu of pretrial detention, even if it only mentioned one condition in particular, which was subsequently reiterated in its written order. See *Carpenter*, 2024 IL App (1st) 240037, ¶ 21 (noting that "[t]he circuit court knows the law including conditions of release

and less restrictive alternatives to detention.") Moreover, the court provided an explanation as to why it did not believe electronic monitoring or other conditions to be appropriate, as it did not believe that defendant would comply with such restrictions based on his actions after the murder. See *Atterberry*, 2023 IL App (4th) 231028, ¶ 19 (noting the importance of courts articulating the reason as to why a particular defendant would not comply with any conditions of release, versus a general threat posed by anyone). Therefore, we find that the record reflects a careful weighing of multiple factors as to the conditions analysis, which implicate safety, fairness, and judicial administrative concerns, all of which were not unreasonable given the circumstances. *Carpenter*, 2024 IL App (1st) 240037, ¶ 21 (under an abuse of discretion standard, appellate courts are not to substitute their judgment in lieu of the circuit court's decision merely because we would have balanced the appropriate factors differently).

¶ 88    In sum, we do not find that the circuit court erred in concluding that the State's petition had satisfied its burden on all three elements of its petition. We ultimately conclude that the circuit court properly granted the State's request for defendant's continued detention following the amendments to the Procedure Code and affirm the order in its entirety.

¶ 89                                        III. CONCLUSION

¶ 90    For the reasons stated, we affirm the judgment of the circuit court.

¶ 91    Affirmed.